# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) EDNA ANESHA SALLIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 10-CV-111-CVE-TLW |
| vs. | ) | |
| | ) | |
| 1) OIL CAPITAL ELECTRIC, L.L.C., a | ) | |
| Domestic Limited Liability Company, | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Daniel E. Smolen, OBA #19943
**SMOLEN, SMOLEN &
ROYTMAN PLLC**
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667
(918) 585-2669 Facsimile
danielsmolen@ssrok.com
Attorney for Plaintiff

July 21, 2011

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ..........................................................................................................1

PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL UNDISPUTED FACTS ...............................................................................2

ADDITIONAL DISPUTED AND MATERIAL FACTS THAT
PRECLUDE SUMMARY DISPOSITION OF PLAINTIFF'S CLAIM ..........................13

STANDARD OF REVIEW FOR SUMMARY JUDGMENT .........................................17

ARGUMENT AND AUTHORITIES...............................................................................17

     I.     PLAINTIFF HAS ESTABLISHED A CLAIM FOR
          HOSTIL WORK ENVIRONMENT...........................................................17

     II:    OCE IS LIABLE FOR THE DISCRIMINATORY
          ACTIONS OF ITS EMPLOYEES .............................................................20

     III:   PLAINTIFF HAS ESTABLISHED HER CLAIM FOR
          RACE AND GENDER DISCRIMINATION...........................................21

     IV:   PLAINTIFF HAS ESTABLISHED HER CLAIM FOR
          RETALIATION......................................................................................22

     V:    DEFENDANT'S LEGITIMATE,
          NONDISCRIMINATORY REASON FOR
          PLAINTIFF'S TERMINATION IS PRETEXT .......................................23

     VI:   DEFENDANT'S ACTIONS CONSTITUTE
          INTENTIONAL INFLICTION OF EMOTIONAL
          DISTRESS ............................................................................................24

CONCLUSION..............................................................................................................25

CERTIFICATE OF SERVICE .......................................................................................26

# **TABLE OF AUTHORITIES**

<u>Cases Cited</u>                                                                                                          <u>Page</u>

*Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505,
91 L. Ed. 2d 202 (1986) ................................................................................................17

*Annette v. Univ. of Kansas*, 371 F.3d 1233 (10th Cir. 2004) ............................................23

*Baty v. Willamette Indus., Inc.,* 172 F.3d 1232 (10th Cir. 1999) ......................................20

*Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994) ................................................................19

*Berry v. Stevinson Chevrolet,* 74 F.3d 980 (10th Cir. 1996) .............................................22

*Causey v. Balog* 162 F.3d 795 (4th Cir. 1998) ..................................................................18

*Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088 (10th Cir. 2005) ...................................23

*Collins v. State of Ill.,* 830 F.2d 692 (7th Cir.1987) ..........................................................22

*Computer Publications, Inc. v. Welton*, 2002 OK 50, 49 P.3d 732 ..................................25

*EEOC v. Flasher Co., Inc.,* 986 F.2d 1312 (10th Cir. 1992) .............................................21

*EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184 (10th Cir. 2000) .....................21

*Faragher* v. *City of Boca Raton,* 524 U.S. 775 (1998) ......................................................20

*Holmes v. Utah, Dept. of Workforce Services*, 483 F.3d 1057 (10th Cir. 2007) ...............20

*Jeffries v. State of Kansas, Department of Social and Rehabilitation
Services*, 946 F.Supp. 1556 (D. Kan. 1996) ...............................................................17, 22

*Kendrick v. Penske Transport Servs, Inc.*, 220 F.3d 1220 (10th Cir. 2000) .....................24

*Lockard v. Pizza Hut,* 162 F.3d 1062 (10th Cir. 1998) ......................................................19

*Mitchell v. City and County of Denver*, 112 Fed. Appx. 662 (10th Cir. 2004) .................21

*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093 (10th Cir. 1999) ...............................19

*Orr v. City of Albuquerque,* 417 F.3d 1144 .......................................................................21

*Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584 (10th Cir. 1994) .................17

*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995) ....................................................17

*Richardson v. New York State Dep't of Correctional Serv.*,
180 F.3d 426 (2d Cir.1999)...................................................................................19

*Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668 (7th Cir.1993)...........................19

*Smart v. Ball State University,* 89 F.3d 437 (7th Cir.1996)...............................................22

*Smith v. Farmers Co-Op Ass'n of Butler*, 825 P.2d 1323 (Okla. 1992) ...........................25

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001)........................................18

*Stover v. Martinez*, 382 F.3d 1064 (10th Cir. 2004).........................................................23

*Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264 (10th Cir. 1998)...................20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1) EDNA ANESHA SALLIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 10-CV-111-CVE-TLW |
| vs. | ) | |
| | ) | |
| 1) OIL CAPITAL ELECTRIC, L.L.C., a | ) | |
| Domestic Limited Liability Company, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Edna Anisha[1] Sallis, through her attorneys of record, and for her *Response to Defendant's Motion for Summary Judgment,* respectfully requests that the Court deny Defendant's Motion. In support, Plaintiff shows the Court the following:

**INTRODUCTION**

Plaintiff, Edna Sallis, hereinafter "Plaintiff," began her employment with Defendant Oil Capital Electric hereinafter "OCE" or "Defendant" on or around October 13, 2008 as an apprentice electrician. Throughout her employment, Plaintiff was subjected to racial discrimination, inappropriate sexual conduct and harassment on the basis of her gender and her race, African American. Plaintiff's Caucasian, male coworkers and supervisors harassed her about how she had no business working on the job site, due to the fact she was female. Plaintiff's coworkers directed their use of the term "nigger" and other racially derogatory language towards Plaintiff. Male coworkers also physically threatened Plaintiff on several occasions.

In addition to the racial hostility and physical violence, Plaintiff was subjected to inappropriate sexual conduct. One male urinated in her presence, Plaintiff's supervisor discussed measuring penises and extremely derogatory and sexually explicit pictures and racial comments

---

[1] Incorrectly spelled in case style. *See*, Ex. 3, p. 7:19-23.

were drawn on porta-potty walls at the job sites. When Plaintiff complained to her supervisors on numerous occasions about the incidents, she was given a multitude of responses, but OCE never remedied the harassment and discrimination.

Ultimately, after Plaintiff lodged numerous complaints about being harassed and discriminated against on the basis of her race and gender, Brian Lewis and Jim Lewis, the owner of Oil Capital Electric, L.L.C., met with Plaintiff and offered her $2,000 for her resignation. When Plaintiff refused the offer, Jim Lewis offered her $23,000, which Plaintiff also refused. Plaintiff was then informed Defendant terminated her employment, under the guise of a reduction in force.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS[2]

1.    Plaintiff does not dispute Defendant's Statement of Material Undisputed Facts ("DSMUF") Nos. 1, 4, 5, 6, 8, 9, 14, 20, 43 and 58.

2.    Plaintiff does not dispute DSMUF No. 2 but adds that first year apprentices receive a lot of on-the-job training provided by journeyman. *See*, Deposition of Brian Lewis, attached here to as Exhibit 1, p. 25:13-24.

3.    Plaintiff does not dispute DSMUF No. 3 but adds journeyman provide on-the-job training to first year apprentices like Plaintiff.

4.    Plaintiff does not dispute DSMMUF No. 7. However, Plaintiff emphasizes the journeyman Plaintiff worked under directed her work and she answered to them. At OCE, journeymen are supervisors over apprentices. *See*, March 28, 2011 Deposition of Jim Lewis, attached hereto as Exhibit 2, p. 30:6-11.

---

[2] Hereinafter referred to as "PRDSMUF"

5.     Plaintiff disputes DSMUF No. 10 insofar as it undermines the severity of the "confrontation" between Plaintiff and Mr. Bowers. Mr. Bowers got in Plaintiff's face and proceeded to curse, yell and scream at her. Mr. Bowers told Plaintiff she did not belong on the job site. Plaintiff was so upset by the incident she called Jacob Caldwell to report the incident and to inform him she needed him. However, Mr. Caldwell never showed up to assist Plaintiff. Thus, Plaintiff was forced to walk down fourteen flights of stairs to find Mr. Caldwell because the situation with Mr. Bowers was so heated. This incident took place only a couple of weeks after Plaintiff began working for OCE at the Hard Rock casino. Mr. Bowers took issue with the fact Plaintiff was a female and made comments that he had never seen a female journeyman or female electrician. *See*, Deposition of Edna Sallis, attached hereto as Exhibit 3, pp. 80:4-81:5.

6.     Plaintiff does not dispute DSMUF No. 11 but clarifies that after walking down the fourteen flights of stairs to get assistance, Plaintiff found Mr. Caldwell and Mr. Fryar in the OCE trailer. She reported to them the confrontation with Mr. Bowers and told them she felt Mr. Bowers was stereotyping her based on her race because he talked to her about drugs and asked her where he could get them. *See*, Ex. 3, pp. 84:19-22, 86:11-88:2.

7.     Plaintiff does not dispute DSMUF No. 12 but adds that though Mr. Bowers no longer directed Plaintiff's work after she complained, Plaintiff was still concerned Mr. Bowers might repeat his actions. Furthermore, Plaintiff was still made to work around Mr. Bowers, and after Plaintiff complained Mr. Bowers discussed his time spent in prison and the fact his prescription drugs made him "really high" on the job site in front of Plaintiff. *See*, Ex. 3, pp. 94:19-95:4.

8.     Plaintiff does not dispute DSMUF No. 12. However, it is important to note Plaintiff was still concerned Mr. Bowers might repeat his actions. Though she was not assigned to work directly under Mr. Bowers, Plaintiff was still made to work around Mr. Bowers, and after

Plaintiff complained Mr. Bowers discussed his time spent in prison and the fact his prescription drugs made him "really high" on the job site in front of Plaintiff. *See*, Ex. 3, pp. 94:19-95:4.

9.     Plaintiff does not dispute DSMUF No. 15 but specifies that Mr. Davis, Plaintiff's supervising journeyman, used the N-word while speaking with Plaintiff. Specifically, Mr. Davis was telling Plaintiff that people on the job site did not like black people, they did not want to work next to black people, they can't stand black people and then he proceeded to use the N-word. Mr. Davis laughed about the use of the N-word. *See*, Ex. 3, pp. 146:18-147:11, 148:6-21.

10.    Plaintiff disputes DSMUF No. 16 in that Plaintiff did not receive proper training because Mr. Davis was not a licensed journeyman. *See*, Ex. 3, p. 102:9-16. While working for Mr. Davis, Plaintiff was made to fill fire holes, which did not provide her with adequate apprentice training. Plaintiff felt she was denied the proper training and given those assignments because she is a black woman. *See*, Ex. 3, pp. 150:22-152:12.

11.    Plaintiff does not dispute DSMUF No. 17. However, Plaintiff told Mr. Davis, the journeyman responsible for training her, she wanted more training. For a period of time, Plaintiff was allowed to work with someone named Jose. However, after she complained about Mr. Davis' racially offensive comments, she was moved back to working under Mr. Davis. At that point, Mr. Davis made Plaintiff pull the tool cart around while he played on his cell phone. Plaintiff continued this type of work for Mr. Davis until she was transferred to the River Spirit site. *See*, Ex. 3, pp. 154:19-156:3.

12.    Plaintiff does not dispute DSMUF No. 18 but emphasizes the specifics of Plaintiff's complaints. Plaintiff complained that Mr. Davis used the N-word in front of her. She also complained that he felt she was being abused based on her race and gender. She documented that this was a problem since she began her employment with OCE. Plaintiff complained that a man

unzipped his pants and urinated right in front of her. She also complained that the elevator operator was constantly making sexual comments to her about touching him in his "special place." *See*, 05/11/08[3] Written Complaint, attached hereto as Exhibit 4.

13.    Plaintiff disputes DSMUF No. 19, as it excludes many important details and states the man urinated inside the porta-potty. The porta-potties were not equipped with a roof. There was a door and a place to use the bathroom inside the porta-potty. Additionally, there was a urinal on the side where one simply walked up to urinate. *See*, Ex. 3, pp. 113:17-21, 114:5-7. When the man urinated in front of Plaintiff, he did so intentionally. The man looked at her as he unzipped his pants. He then pulled out his penis and proceeded to urinate in Plaintiff's presence. *See*, Ex. 3, pp. 114:19-115:25. Once Plaintiff realized what the man was doing, she turned her head. *See*, Ex. 3, p. 119:4-8. Plaintiff was disgusted and felt humiliated and disrespected that a man would urinate intentionally in her presence. *See*, Ex. 3, p. 19:20-25.

14.    Plaintiff does not dispute DSMUF No. 21 but adds the elevator operator made comments of a sexual nature to Plaintiff on a daily basis, a couple of times per day. He would say things like, "Edna why are you touching me in my private spots?" and "My little mamacita, if I was only like 20 years younger." The operator made these comments in front of other OCE employees. Sometimes Plaintiff was alone on the elevator with the operator and he made the same comments. *See*, Ex. 3, pp. 122:7-123:25, 124:10-15. The majority of the time, excluding break periods, the same man operated the elevator while Plaintiff worked at the Hard Rock job site. *See*, Ex. 3, p. 122:7-14.

15.    Plaintiff disputes DSMUF No. 22. Mr. Davis, Plaintiff's supervising journeyman, used the N-word while speaking with Plaintiff. Specifically, Mr. Davis was telling Plaintiff that

---

[3] This complaint was incorrectly dated "5/11/08." It should have been dated 05/11/09, as Plaintiff did not begin her employment with OCE until October 2008 and was terminated on July 21, 2009.

people on the job site did not like black people, they did not want to work next to black people, they can't stand black people and then he proceeded to use the N-word. Mr. Davis laughed about the use of the N-word. *See*, Ex. 3, pp. 146:18-147:11, 148:6-21.

16.   Plaintiff disputes DSMUF No. 23. While working for Mr. Davis, Plaintiff was made to fill fire holes, which did not provide her with adequate apprentice training. Plaintiff felt she was denied the proper training and given those assignments because she is a black woman. *See*, Ex. 3, pp. 150:22-152:12. Thus, Plaintiff articulated Mr. Davis treated her differently because she is both black and a woman.

17.   Plaintiff disputes DSMUF No. 24. Mr. Fryar and the Flintco employee asked Plaintiff what they should do about her complaints. She told them they should follow their policies regarding instances like this. *See*, Ex. 3, pp. 129:17-131:9.

18.   Plaintiff disputes DSMUF No. 26, as it undermines Mr. Fryar's use of the word "nigger" during his conversation with Plaintiff. After Plaintiff expressed of complaint over Mr. Davis' use of the word "nigger," Mr. Fryar began using the word "nigger" like it was part of his every day vocabulary. He used the word more than ten times in that conversation. Plaintiff described it has he "had a field day with it." Plaintiff felt that was inappropriate. *See*, Ex. 3, pp. 132:14-133:23.

19.   Plaintiff does not dispute DSMUF No. 27 but adds Plaintiff did not know Mr. Davis was suspended. *See*, Ex. 3, p. 166:1-10. Additionally, Plaintiff told Mr. Fryar and the Flintco employee who asked Plaintiff what they should do about her complaints that they should follow their policies regarding instances like this. *See*, Ex. 3, pp. 129:17-131:9.

20.   Plaintiff disputes DSMUF No. 28 in that it mischaracterizes Plaintiff's testimony. Though Plaintiff did not believe Mr. Fryar took her complaint seriously, she testified that she felt

she was being punished for her complaints by being transferred to a different job site. *See*, Ex. 3, p. 136:16-21.

21.  Plaintiff disputes DSMUF No. 29. Plaintiff felt she was being punished for taking her complaints to Mr. Fryar when she was transferred to a different job site. *See*, Ex. 3, p. 136:16-21.

22.  Plaintiff disputes DSMUF No. 30. Plaintiff explained she believed OCE should have had a policy in place providing the appropriate response to Plaintiff's complaints. *See*, Ex. 3, pp. 137:12-139:10.

23.  Plaintiff does not dispute DSMUF No. 31 but adds that Plaintiff was offended by the actions of Mr. Davis, the elevator operator and the man who urinated in her presence. Their actions made her feel abused, and after the man urinated in her presence, she had enough. Plaintiff expected to be treated with respect like the other employees. *See*, Ex. 4.

24.  Plaintiff does not dispute DSMUF No. 32 but emphasizes Mr. Fryar "sugar-coated" the issues in the meeting. He did not tell the employees OCE would not tolerate any kind of discrimination. *See*, Ex. 3, pp. 173:10-174:10.

25.  Plaintiff disputes DSMUF No. 33. In that conversation, Mr. Lyons told Plaintiff, "they call black people niggers, Mexicans wetbacks, they call white people honkys." Plaintiff told Mr. Lyons she was offended and she did not like it. Plaintiff does not believe Mr. Lyons was expressing disagreement with any of those terms. *See*, Ex. 3, pp. 177:14-178:23.   Plaintiff disagrees with Mr. Lyons' statement. *See*, Ex. 3, p. 176:11-13.

26.  Plaintiff does not dispute DSMUF No. 34 but emphasizes Mr. Lyons was not disciplined for his use of racially derogatory terms, including the word "nigger," while Plaintiff was transferred to another job site after her complaints. Plaintiff felt the transfer was punishment for her complaints. *See*, Ex. 3, p. 136:16-21.

27.    Plaintiff does not dispute DSMUF No. 35 but adds Plaintiff believes the transfer was punishment for her complaints. *See*, Ex. 3, p. 136:16-21.

28.    Plaintiff disputes DSMUF No. 36. Plaintiff's employment was terminated after she told Jim Lewis and Brian Lewis she could not return to the jobsite, the place where she was being subjected to a hostile work environment and discrimination. It was not until Plaintiff made numerous complaints about the work environment and treatment and refused Jim Lewis' offers of $2,000 and then $23,000 for her resignation that Plaintiff was informed she would be part of a "reduction in force."  *See*, Ex. 3, pp. 222:25-227:7.

29.    Plaintiff does not dispute DSMUF No. 37 but adds the other OCE employees knew right away that she was going to another jobsite. *See*, Ex. 3, p. 167:13-20. Furthermore, employees were shifted from site to site based on day-to-day needs of the project. *See*, Ex. 1, p. 13:3-13.

30.    Plaintiff disputes DSMUF No. 38. Plaintiff complained to Rob Bippus, foreman, that she was taunted in a ditch by her coworker, Andy, and another OCE employee. Plaintiff was standing on a pipe over a water-filled trench when the men began dangerously rolling the pipe, which could have caused Plaintiff to fall off into the trench. James Gatewood watched the incident silently. Plaintiff had only been working at River Spirit for a matter of weeks when this incident occurred. *See*, Ex. 3, pp. 188:16-189:5, 189:22-190:5. Plaintiff believes the men taunted her because of her race and gender. *See*, Ex. 3, p. 192:3-7. Plaintiff heard Mr. Gatewood complain about Andy doing "silly things," not the taunting incident wherein he endangered Plaintiff's life. *See*, Ex. 3, p. 191:7-12. Jim Lewis admitted the actions of the two males who rolled the pipe on Plaintiff would be a violation of safety policies, but the employees involved were not written-up. *See*, Ex. 8, pp. 46:23-48:2.

31.    Plaintiff disputes DSMUF No. 39. Plaintiff testified she believed they taunted her on the pipe because she was a black woman. *See*, Ex. 3, p. 192:3-7. Furthermore, Defendant's fact does not provide details regarding the spitting incident. The other male coworker involved in the pipe incident walked up to Plaintiff and spit directly on her shoes. He told Plaintiff she was going to "piss" everybody off and needed to go home. Plaintiff never witnessed the man spit on anyone else. *See*, Ex. 3, pp. 192:23-194:2.

32.    Plaintiff does not dispute DSMUF No. 40. However, importantly, Brian Lewis did not meet with Plaintiff in person regarding any of her complaints until she had to call the police to the job site because of an altercation with James Gatewood, her supervising journeyman, wherein she felt threatened. *See*, Ex. 3, p. 196:7-23. Plaintiff had called Brian Lewis on multiple occasions before this incident with Mr. Gatewood to express her concerns over being spit on, the taunting pipe rolling incident and being sent home by Mr. Gatewood. *See*, Ex. 3, pp. 195:15-196:6; Ex. 1, p. 52:2-11, 64:12-65:6, 66:10-67:3; 67:15-23. Before moving to the River Spirit site, Plaintiff also received Plaintiff's complaints regarding Randy Davis, the elevator operator, and the man who urinated in front of her. *See*, Ex. 1, pp. 34:20-36:11.

33.    Plaintiff disputes DSMUF No. 41. Instead of meeting with Plaintiff, Brian Lewis met with Ron Bippus to follow-up on Plaintiff's complaints. The other employees denied the occurrences but Brian Lewis and Mr. Bippus did nothing further to investigate Plaintiff's claims, though Brian Lewis did not think Plaintiff was making up the allegations. *See*, Ex. 1, pp. 67:24-68:21, 49:5-9.

34.    Plaintiff disputes DSMUF No. 42. When Plaintiff complained to Mr. Bippus about the spitting incident, he said he did not believe her. Plaintiff encouraged him to view the cameras, which would have captured the incident. In response, Mr. Bippus walked off. *See*, Ex. 3, p.

203:1-9. The very next day, Mr. Bippus made her fill a ditch that a backhoe had dug out by herself with a shovel. Mr. Bippus complained that Plaintiff did not have enough filled in at some point and presented to her with an attitude. Furthermore, Plaintiff informed Mr. Bippus she felt this was her punishment for complaining. Mr. Bippus said nothing in response. *See*, Ex. 3, pp. 201:24-203:2.

35.    Plaintiff disputes DSMUF No. 44. Plaintiff testified Mr. Gatewood criticized her performance because she was a woman. Though Mr. Gatewood never told her so, his actions spoke louder than words. Mr. Gatewood denied Plaintiff training and assignments. He did not speak to her at times and had her follow him around like a little puppy. *See*, Ex. 3, pp. 198:2-199:19.

36.    Plaintiff disputes DSMUF No. 45, Mr. Gatewood did provide Plaintiff with some training, though he did ignore her and deny her assignments and training. When asked to recall what training Mr. Gatewood provided, Plaintiff could only recall Mr. Gatewood or another gentlemen showing her how to wire light poles and bending pipe. Plaintiff believed Mr. Gatewood assigned her to another man to bend pipe because he did not want to work with her. *See*, Ex. 3, pp. 199:20-201:1.

37.    Plaintiff disputes DSMUF No. 46. Plaintiff complained to Mr. Bippus that she was not getting assignments, Mr. Bippus would not talk to her and no one was training her. Mr. Bippus did not have much to say in response. *See*, Ex. 3, p. 195:3-14.

38.    Plaintiff disputes DSMUF No. 47 in that it does not accurately describe the drawings and statements in the porta-potties at River Spirit. The porta-potty walls are covered in sexually graphic drawings, including drawings of naked women, penises, women performing oral sex, vaginas and pubic hair. Written on the porta-potty walls are racially derogatory terms such as

niggers, "arien brother hood," and "Koo Klux Clan." *See*, Photographs of Porta-Potty Walls, attached hereto as Exhibit 5. Plaintiff also saw "I hate niggers" written on a porta-potty wall, which she testified she did not see until after she starting having problems at River Spirit. *See*, Ex. 3, pp. 233:8-234:2. Plaintiff took other photographs of nasty drawings in the porta-potties at the Hard Rock site but she is unable to retrieve them off of a damaged cell phone. *See*, Ex. 3, p. 243:5-15. The elevator at the Hard Rock site displayed racially offensive comments such as "Whites Only Porta-Potty," "Brown Niggers," and "No Niggers." *See*, Ex. 3, p. 243:16-23.

39.   Plaintiff does not dispute DSMUF No. 48. However, it is important to note the lead persons and foremen at River Spirit were aware of the porta-potty drawings by virtue of using them on a daily basis. *See*, Ex. 3, p. 237:19-22. Brian Lewis testified that the supervisors should have informed the construction manager about the porta-potties if they knew of their condition. *See*, Ex. 1, pp. 73:22-74:22.

40.   Plaintiff does not dispute DSMUF No. 49 but emphasized Plaintiff felt threatened by Mr. Gatewood. *See*, Ex. 3, p. 196:7-23.

41.   Plaintiff disputes DSMUF No. 50. Plaintiff's notes indicate she met with Brian Lewis and Jim Lewis on Monday, July 20, 2009. *See*, Sallis' Notes, attached hereto as Exhibit 6. In that meeting, Plaintiff was given three options: (1) return to the job site, (2) take money[4] in exchange for her resignation and a release, or (3) she would become part of a "reduction in force." *See*, Ex. 2, p. 85:21-24. Plaintiff was not given the option to transfer to another job site though Brian Lewis had offered her that option only two days prior. *See*, Ex. 2, p. 87:9-20; Ex. 1, pp. 102:20-104:13. At the meeting, Plaintiff informed Brian Lewis and Jim Lewis she was willing to transfer to another job site, but she was denied that option. *See*, Jim Lewis' Notes, attached hereto as

_____

[4] Plaintiff testified Jim Lewis offered her $2,000 initially, and when she refused that, he offered her $23,000.

Exhibit 7; Ex. 2, p. 31:16-25. Importantly, there is no evidence to support any assertion that Plaintiff was advised the issues she was having at River Spirit would be dealt with if she returned to the site. *See*, Ex. 2, p. 61:1-5; Ex. 8, p. 61:1-5. Additionally, Brian Lewis testified it is not common at OCE to offer an employee who is being subjected to a reduction in force a month's salary, and he cannot recall any employee receiving such an offer before Plaintiff. *See*, Ex. 1, p. 151:1-8. Jim Lewis did not discuss that he was going to offer Plaintiff money with his son, Brian Lewis, before the meeting. Brian Lewis testified because Jim Lewis is the majority owner he can make that decision, and Brian Lewis will not question it. *See*, Ex. 1, p. 151:17-23.

42.   Plaintiff disputes DSMUF No. 51. Just two days before Plaintiff's employment was terminated, Brian Lewis offered Plaintiff the option to transfer to another job site. *See*, Ex. 1, pp. 102:20-104:13.

43.   Plaintiff does not dispute DSMUF No. 52, in that Plaintiff did not know how many OCE employees were subject to a reduction in force in 2009. However, the evidence shows Plaintiff was the only OCE employee laid off on July 21, 2009. *See*, Defendant's Exhibit 7, filed under seal.

44.   Plaintiff disputes DSMUF No. 53. The documentation provided by Defendant shows only 31 other employees were laid off in July, August and September 2009. Furthermore, Plaintiff was the only employee laid off on July 21, 2009. *See*, Defendant's Exhibit 7, filed under seal.

45.   Plaintiff does not dispute DSMUF No. 54 but adds that Plaintiff's employment with OCE was terminated after she made numerous complaints about her working environment, supervisors and coworkers. *See*, Ex. 2, p. 88:13-20. Plaintiff informed Brian Lewis and Jim Lewis of her complaints and even brought her handwritten notes to the meeting, but Jim Lewis was not interested in reviewing them. *See*, Ex. 3, p. 209:4-20. Plaintiff believed by OCE's actions that

she was being blown off and labeled a whiner for her complaints. *See*, Ex. 3, p. 211:9-17; Ex. 2, pp. 106:21-107:24.

46. Plaintiff does not dispute DSMUF No. 55. However, Plaintiff testified she was not taking anxiety medication on a regular basis before her employment with OCE. Plaintiff has been taking anxiety medication more regularly since she began working at OCE and possibly took the medication daily in 2010. *See*, Ex. 3, pp. 279:14-17, 279:24-280:7, 282:23-283:2, 283:19-284:22, 292:20-293:8.

47. Plaintiff does not dispute DSMUF No. 57 but clarifies that Plaintiff's blood pressure increased since she began working at OCE, and, as a result, Plaintiff's blood pressure medicine was increased. *See*, Ex. 3, pp. 272:18-273:5, 276:5-13, 296:17-22.

## ADDITIONAL DISPUTED AND MATERIAL FACTS THAT PRECLUDE SUMMARY DISPOSITION OF PLAINTIFF'S CLAIM[5]

1. Plaintiff graduated from Vatterott in 2007 where she studied electrical, mechanical and program logic control. The program Plaintiff participated in was a 1 ½ to 2-year program. *See*, Ex. 3, pp. 20:20-21:9.

2. Plaintiff worked for American Airlines in 2000 until 2008. Plaintiff went to school and worked full-time, while at American Airlines. *See*, Ex. 3, p. 27:6-22.

3. Plaintiff left her eight-year position with American Airlines to start work in the field as an apprentice electrician. *See*, Ex. 3, pp. 27:23-28:2.

4. There was a tribal preference in place for the Hard Rock job, which was a Cherokee Nation project. OCE hired Cherokee employees, like Plaintiff, as part of an agreement with the Cherokee Nation. *See*, Ex. 3, p. 56:9-11; Ex. 1, pp. 19:13-21:11, 23:20-24:4.

5. Plaintiff was one of two African Americans working at the Hard Rock job site. *See*, Ex.

---

[5] Hereinafter referred to as "ADMF"

3, p. 76:12-14. Plaintiff was the only female working on site with OCE in 2008 and 2009 at the Hard Rock and River Spirit projects. *See*, Ex. 2, p. 67:17-22.

6.    Before complaining to Bill Fryar on May 11, 2009, Plaintiff was afraid she would get in trouble and wondered whether OCE would get rid of her for complaining. *See*, Ex. 3, pp. 127:21-128:9. When Plaintiff made her complaints to Mr. Fryar and Jacob Caldwell, they both told her there was nothing that could be done because OCE did not have a policy against such conduct. *See*, Ex. 3, pp. 304:1-10, 305:22-306:2, 307:23-308:5.

7.    When Plaintiff complained on May 11, 2009, Mr. Fryar told her that OCE had been good to her, gave her a job. More or less, he told Plaintiff OCE did not have to give her a job, but they had her out there working. *See*, Ex. 3, p. 169:5-16.

8.    After Plaintiff complained about the elevator operator, he continued to harass her and told her she did not have to go over his head and say anything. The situation was stressful for Plaintiff. *See*, Ex. 3, pp. 125:16-126:5, 126:10-15.

9.    While working at the River Spirit job site, Plaintiff's supervisor, Ron Bippus, made her use an unsafe scissor lift. The hinges on the lift were broken. When Plaintiff told Mr. Bippus the lift was broken, he more or less told her to get up there and do her job before walking off. *See*, Ex. 3, p. 238:17-25, 247:25-248:7, 248:25-249:7, 249:21-250:4.

10.   Plaintiff once asked James Gatewood if he would allow someone to talk to his mother like he talked to her and whether he would allow someone to talk to his wife and treat his wife the way he treated her. Mr. Gatewood responded by telling Plaintiff not to bring anyone else into it. *See*, Ex. 3, p. 201:5-18. At one point, when Plaintiff asked for assistance with carrying a ten-foot pipe, Mr. Gatewood told Plaintiff if she did not keep her mouth shut, she would find her way to the streets. *See*, Ex. 3, pp. 299:3-300:14.

11.  At a safety lunch at the River Spirit job site, Plaintiff sat at a table with some male coworkers and Mr. Bippus. A man won a tape measure and Mr. Bippus yelled, "Well, what are you going to do with it? Are you going to measure your dick to see how long it is?" *See*, Ex. 3, pp. 301:4-302:3.

12.  Plaintiff left messages for Jim Lewis regarding the treatment she was receiving but did not meet him until he terminated her employment. *See*, Ex. 3, pp. 60:4-8, 63:23-64:10. Jim Lewis was aware of Plaintiff's complaints before meeting her. *See*, Ex. 2, pp. 71:15-72:8, 40:12-41:24, 75:11-19. Jim Lewis never conducted an on-site investigation regarding Plaintiff's complaints nor did he talk to Plaintiff's supervisors. *See*, Ex. 2, pp. 94:18-95:5. Plaintiff made complaints that her supervisors at River Spirit were insensitive to her complaints and did not respond appropriately. However, Plaintiff's supervisors were not disciplined. *See*, Ex. 2, pp. 64:7-65:7.

13.  Plaintiff left messages for Brian Lewis regarding her complaints about being treated unfairly. Plaintiff also had complaints faxed to Brian Lewis. *See*, Ex. 3, p. 66:9-20. Outside of the single police incident, Brian Lewis never spoke with Mr. Gatewood regarding Plaintiff's complaints. *See*, Ex. 1, p. 112:3-20.

14.  The OCE office telephone number is 317-3255. Plaintiff's cell phone number is 230-2247. *See*, Ex. 8, pp. 48:20-23, 50:1-4, 51:15-19. Plaintiff's phone records reveal she called the OCE office on many occasions without a return phone call. *See*, Phone Records, attached hereto as Exhibit 11. The telephone calls correlate with the events Plaintiff documents in her diary Jim Lewis did not want to review. *See*, Ex. 6.

15.  Jim Lewis decided on the three options[6] that were presented to Plaintiff at the

---

[6] Defendant's first responses to Plaintiff's interrogatories indicated Plaintiff was given the option to transfer at the termination meeting. *See*, Interrogatory Responses, attached hereto as Exhibit 9.

termination of her employment. *See*, Ex. 2, p. 112:2-4. He had already made the decision to terminate Plaintiff is she refused to return to the job site before meeting with Plaintiff. *See*, May 11, 2011 Deposition of Jim Lewis, attached hereto as Exhibit 8, p. 55:14-20. Jim Lewis felt Plaintiff could return to the job site at River Spirit in spite of her reports that she felt like she was in danger, she was spit on, the men did not listen to her and she was denied training. *See*, Ex. 8, 59:23-60:18.

16.   Plaintiff's attendance and performance did not play into Jim Lewis' decision to present the three options to Plaintiff. *See*, Ex. 2, p. 111:5-15.

17.   OCE has had around 300 employees for the past five years. However, since 2003, when OCE became an independent company, it has not had a human resources department or a designated human resources representative. *See*, Ex. 2, pp. 17:4-25.

18.   OCE's Employee Handbook is the only document that governed employment practices at OCE in 2008 and 2009, excluding safety manuals and materials. *See*, Ex. 2, pp. 33:9-34:16, 38:3-7; Ex. 12. The Employee Handbook does not provide a policy regarding employee grievances. In 2008 and 2009, OCE had no written policies or procedures regarding workplace harassment or any written direction for supervisors dealing with sexual harassment issues. *See*, Ex. 2, pp. 21:11-25, 49:3-14, 52:8-12; Ex. 1, p. 16:15-22; Ex. 12. Furthermore, in 2008 and 2009, OCE did not maintain a disciplinary policy regarding discrimination or harassment. *See*, Ex. 1, 17:3-17; Ex. 12.

19.   Jim Lewis testified it is important that an employee has a chance to report harassment and understands reporting policies. *See*, Ex. 2, pp. 47:20-48:5. However, OCE does not maintain a form for employee complaints. *See*, Ex. 2, p. 65:14-18.

---

Jim Lewis reviewed the answers for accuracy but now claims Plaintiff was not given an option to transfer at the time she was terminated. *See*, Ex. 8, pp. 14:13-15:14, 19:20-20:9; Supplemental Interrogatory Responses, attached hereto as Exhibit 10.

20.   Plaintiff is a single mother who went to school to try to make life better for her children. She thought she would have a career as an electrician. Her experience at OCE affected her emotionally. She experienced depression and fear. Plaintiff fears she will experience the same treatment and discrimination at another electrical position. *See*, Ex. 3, pp. 266:15-268:7.

21.   Plaintiff lost fifty pounds and experienced increased blood pressure and migraines as result of OCE's actions. *See*, Ex. 3, pp. 272:18-273:5, 276:5-13.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is "used sparingly in employment discrimination cases." *Jeffries v. State of Kansas, Department of Social and Rehabilitation Services*, 946 F.Supp. 1556, 1561 (D. Kan. 1996).  This is so because claims often turn on the employer's intent and courts ordinarily consider summary judgment inappropriate to settle an issue like intent. *Id.* For the purposes of summary judgment, and indeed for trial, it is not necessary for Plaintiff to present direct evidence of pretext. Since the "ultimate fact turns on Defendant's state of mind, it is particularly difficult to establish by direct evidence." *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994).  Plaintiff's case may be built entirely upon circumstantial evidence.  *Id.* Plaintiff need only present circumstantial evidence of her *prima facie* case and some evidence of pretext. *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995). On a motion for summary judgment "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ARGUMENT AND AUTHORITIES

PROPOSITION I:     PLAINTIFF HAS ESTABLISHED A CLAIM FOR HOSTILE WORK
                   ENVIRONMENT

To establish the prima facie case of a hostile work environment claim, Plaintiff must

demonstrate that a reasonable jury could find the harassment she endured to be: 1) unwelcome; 2) based on her race and gender; and 3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) citing *Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998).

Plaintiff clearly satisfies the first prong of the *prima facie* case, as Plaintiff lodged numerous complaints regarding the fact the harassment she endured was unwelcome. Plaintiff can also easily show that the harassment she suffered from based on her race and gender and was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere. The porta-potties used by OCE employees and supervisors alike were covered in sexually explicit drawings and racially derogatory terms. PRDSMUF No. 38. Plaintiff was told by a male coworker that she did not belong on the job site and that he had never seen a female electrician. PRDSMUF No. 5. Plaintiff's coworkers and supervisors used the word "nigger" while speaking to her, laughed about it and made other racially derogatory comments. PRDSMUF Nos. 9, 18, 25. Plaintiff endured sexually harassing comments from an elevator operator on a daily basis and a man intentionally pulled his penis out to urinate in front of Plaintiff. PRDSMUF Nos. 13, 14. Furthermore, Plaintiff's supervisor, Ron Bippus, commented about another male coworker measuring his "dick" while sitting at the same table as Plaintiff. ADMF No. 10. Plaintiff's supervisor and journeyman at River Spirit criticized her work and told her if she would find her way to the streets if she did not keep her mouth shut when Plaintiff asked for assistance carrying a large pipe. ADMF No. 11. Plaintiff was physically threatened by her coworkers while her supervisor watched silently. PRDSMUF No. 30. Additionally, Plaintiff was so threatened by Mr. Gatewood on one occasion she called the police for assistance. PRDSMUF No. 32. Plaintiff's coworkers spit directly on Plaintiff's shoe and told her she was

going to "piss" everybody off and needed to go home. PRDSMUF No. 31.

Plaintiff was forced to endure this harassment throughout the eight months of her employment with OCE. It is clear the harassment altered the conditions of Plaintiff's employment. She was made to hand-fill a ditch by herself for punishment for her complaints. PRDSMUF No. 34. Additionally, her journeyman ignored her and made her follow him around like a puppy. PRDSMUF No. 35. This resulted in Plaintiff losing assignments and valuable training opportunities. PRDSMUF No. 36. The Tenth Circuit has noted that "the severity and pervasiveness evaluation…is 'quintessentially a question of fact." *See, O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) quoting *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994). Accordingly, "there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a Plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2nd Cir.1999) (quoting *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 674 (7th Cir.1993)). The above evidence demonstrates Plaintiff satisfies her claim for a hostile work environment.

OCE claims it is not responsible for the conduct of those individuals not employed by it or those things outside its control, specifically the elevator operator, the urinating man and the porta-potties. To the contrary, the Tenth Circuit recognizes that employers are in fact obligated to protect employees from sexual harassment perpetrated by third-party non-employees. The "EEOC regulations specifically provide that an employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer…knows or should have known of the conduct and fails to take immediate and appropriate corrective action." *Lockard v. Pizza Hut,* 162 F.3d 1062, 1073 (10th Cir. 1998); *see*

*also, Holmes v. Utah, Dept. of Workforce Services*, 483 F.3d 1057, 1065 (10th Cir. 2007). The elevator operator continued to harass Plaintiff after she complained, telling her she shouldn't have went over his head. ADMF No. 9. Thus, any action taken by OCE was not sufficiently corrective. Additionally, OCE supervisors knew about the porta-potties and never contacted anyone to replace the porta-potties as they should have. PRDSMUF No. 39. Thus, OCE can be held liable, though the conduct did not originate from its own employees.

PROPOSITION II:   OCE IS LIABLE FOR THE DISCRIMINATORY ACTIONS OF ITS EMPLOYEES

OCE failed to remedy the hostile work environment created by Plaintiff's coworkers and supervisors. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Faragher* v. *City of Boca Raton,* 524 U.S. 775, 777 (1998). "[C]onduct creating a hostile work environment is within the scope of employment for purposes of Title VII employer liability if it was motivated by an intent to serve the employer. *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998).  Further, the Tenth Circuit also upheld use of the "knew or should have known" test. *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232 (10th Cir. 1999).

Contrary to OCE's argument, undisputed evidence shows the journeyman and foreman who supervised Plaintiff were perpetrators of the harassment and discrimination. In and of itself, that is enough to establish OCE's liability. Furthermore, Plaintiff complained on numerous occasions, verbally and in writing, regarding the harassment she endured at the hands of her coworkers. Plaintiff even took her complaints to Brian Lewis and Jim Lewis, Vice President and majority shareholder, respectively. ADMF Nos. 13, 14. Many of the perpetrators were not disciplined and continued in their conduct. Some of Plaintiff's complaints were ignored because

OCE did not have sufficient policies. ADMF No. 7. Thus, OCE knew of the harassment and failed to remedy it, making it liable.

PROPOSITION III:    PLAINTIFF HAS ESTABLISHED HER CLAIM FOR RACE AND GENDER DISCRIMINATION

"At the *prima facie* stage of the *McDonnell Douglas* analysis, a Plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant. *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1193 (10th Cir. 2000). At the *prima facie* stage, the Plaintiff's burden is 'not onerous,' which is evidenced by the 'small amount of proof necessary to create an inference of discrimination.'" *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 citing *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1318 (10th Cir. 1992). Plaintiff must make out a prima facie case of discrimination by demonstrating (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees.    *See, Mitchell v. City and County of Denver*, 112 Fed. Appx. 662, 670-71, (10th Cir. 2004).

Plaintiff was one of two African Americans working on the job site and was the only female on the job site. Her employment with OCE was permeated with differences in treatment based on her race and gender. Plaintiff was told by a male coworker that she did not belong on the job site and that he had never seen a female electrician. PRDSMUF No. 5. Plaintiff's coworkers and supervisors used the word "nigger" while speaking to her, laughed about it and made other racially derogatory comments. PRDSMUF Nos. 9, 18, 25. Plaintiff endured sexually harassing comments from an elevator operator on a daily basis and a man intentionally pulled his penis out to urinate in front of Plaintiff. PRDSMUF Nos. 13, 14. Furthermore, Plaintiff's supervisor, Ron Bippus, commented about another male coworker measuring his "dick" while sitting at the same table as Plaintiff. ADMF No. 10. Plaintiff's supervisor and journeyman at

River Spirit criticized her work and told her if she would find her way to the streets if she did not keep her mouth shut when Plaintiff asked for assistance carrying a large pipe. ADMF No. 11. Plaintiff was physically threatened by her coworkers while her supervisor watched silently. PRDSMUF No. 30. Additionally, Plaintiff was so threatened by Mr. Gatewood on one occasion she called the police for assistance. PRDSMUF No. 32. Plaintiff's coworker spit directly on Plaintiff's shoe and told her she was going to "piss" everybody off and needed to go home. PRDSMUF No. 31. Plaintiff was made to hand-fill a ditch by herself for punishment for her complaints. PRDSMUF No. 34. Additionally, her journeyman ignored her and made her follow him around like a puppy. PRDSMUF No. 35. This resulted in Plaintiff losing assignments and valuable training opportunities that were afforded to the Caucasian male employees. PRDSMUF No. 36.

Plaintiff suffered an adverse employment action when she was transferred from the Hard Rock site to the River Spirit site as punishment for her complaints. "Courts liberally define an adverse employment action." *Jeffries,* 946 F. Supp. at 1567 (citing *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir. 1996). "'[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.'" *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996) (quoting *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987)). Plaintiff suffered another adverse employment action when her employment was terminated after she refused to return to the hostile work environment. Accordingly, Plaintiff has established a *prima facie* case for gender and race discrimination.

PROPOSITION IV:   PLAINTIFF HAS ESTABLISHED HER CLAIM FOR RETALIATION

In order to establish a *prima facie* case for retaliation the Plaintiff must show that she: 1) engaged in protected opposition to discrimination; 2) the Defendant took an adverse employment

action against her; and 3) there exists a causal connection between the activity and the adverse action.  *See, Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). As indicated in the record, Plaintiff made numerous complaints to her supervisors and upper level officers at OCE. Plaintiff suffered an adverse employment action when she was terminated on July 21, 2009. A causal connection is established by showing "evidence of circumstances that justify an inference of retaliatory motive, such as protected activity closely followed by adverse action." *Annette v. Univ. of Kansas*, 371 F.3d 1233, 1240-1241 (10th Cir. 2004). Many of Plaintiff's complaints were never remedied, as OCE simply sided with its male employees. PRDSMUF No. 33. Furthermore, the termination occurred in a meeting where Plaintiff again expressed her complaints about her working environment. PRDSMUF No. 33. Plaintiff was told to return to the jobsite without reassurance the harassment would be remedied or she would lose her job. PRDSMUF No. 33. Accordingly, Plaintiff has satisfied the elements of her prima facie case of retaliation under *Stover*.

PROPOSITION V:   DEFENDANT'S LEGITIMATE, NONDISCRIMINATORY REASON
                 FOR PLAINTIFF'S TERMINATION IN PRETEXT

Once a Plaintiff can establish a *prima facie* case of discrimination or retaliation, the burden shifts directly to Defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment actions which are at issue.  *Chavez v. Thomas & Betts Corp*., 396 F.3d 1088, 1104 (10th Cir. 2005). Assuming, *arguendo,* OCE can meet its burden under the circumstantial evidence standard, which Plaintiff strongly refutes, the burden then shifts to Plaintiff to show that OCE's proffered reason for the differences in treatment was pretext for discrimination and retaliation. "A Plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." *Chavez*, 396

F.3d at 1104 *citing Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).  If a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual, i.e., unworthy of belief, plaintiff can withstand a summary judgment motion and is entitled to go to trial. *Kendrick v. Penske Transport Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

OCE's proffered legitimate, nondiscriminatory reason for Plaintiff's termination is that Plaintiff was subjected to a reduction in force because there were no other positions available once Plaintiff refused to return to the River Spirit worksite. However, the evidence undermines OCE's proffered explanation and establishes it as mere pretext. Importantly, Brian Lewis offered Plaintiff a transfer just two days before the termination meeting, but somehow a transfer was no longer an option when Plaintiff came to the meeting. PRDSMUF Nos. 41, 42. Furthermore, Jim Lewis had already made the decision to terminate Plaintiff if she did not return to River Spirit before the meeting. Interestingly, Plaintiff was the only employee laid off on July 21, 2009. PRDSMUF No. 44. In the meeting, Plaintiff informed Brian Lewis and Jim Lewis of the working conditions and her complaints. She brought her handwritten diary to the meeting but Jim Lewis was not interested in reviewing it. PRDSMUF No. 45. Oddly, Jim Lewis presented Plaintiff with two monetary offers in exchange for her resignation and a release of liability, an offer Brian Lewis testified was out of the ordinary regarding a laid off OCE employee. PRDSMUF Nos. 28, 41. When Plaintiff refused both offers, she was told she would be included in the reduction in force. *Id*. As the evidence demonstrates, the reduction in force is nothing more than OCE's guise for discrimination. Thus, Plaintiff has established pretext.

PROPOSITION VI:   DEFENDANT'S   ACTIONS   CONSTITUTE   INTENTIONAL
                  INFLICTION OF EMOTIONAL DISTRESS

Under Oklahoma law, to recover on a claim of intentional infliction of emotional distress,

the plaintiff must prove: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 7, 49 P.3d 732, 735. "Extreme and outrageous character of the conduct may arise from an abuse by the actor of a position…which gives him actual or apparent authority over the other, or power to affect his interests." *Id*. Duration of the distress and the position of the abusers are considerations. *See id.*; *Smith v. Farmers Co-Op Ass'n of Butler*, 825 P.2d 1323, 1327 (Okla. 1992).

Plaintiff was continually harassed by both supervisors and coworkers on the basis of her gender and race throughout her employment with OCE. Plaintiff's coworkers even endangered her life while her supervisor watched silently. PRDSMUF No. 30. Plaintiff was forced to view sexually explicit and disgusting pictures and endured racial comments and derogatory language throughout her employment. PRDSMUF Nos. 12, 14, 18, 38. Plaintiff suffered from extreme weight loss, increased blood pressure, increased anxiety and migraines as a result of Defendant's actions. ADMF No. 22. Accordingly, Plaintiff presents evidence sufficient to establish her *prima facie* case for intentional infliction of emotional distress, negating summary judgment.

## CONCLUSION

Defendant has failed to meet its burden of establishing there are no genuine issues of material fact and that it is entitled to summary judgment beyond a reasonable doubt. Based upon the foregoing arguments and authorities, Defendant's Motion for Summary Judgment should be denied.

25

Respectfully submitted,


/s/Daniel E. Smolen_____
Daniel E. Smolen, OBA #19943
**SMOLEN, SMOLEN &**
**ROYTMAN, PLLC**
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667
(918) 585-2669 Facsimile
danielsmolen@ssrok.com
Attorney for Plaintiff


## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 21, 2011 I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: Jo Anne Deaton, Lindsay McDowell, Kelly Monaghan and John Folks.


/s/ Daniel E. Smolen, OBA #19943